DOMENIC M. DIPIERO AND ROSERA S. DIPIERO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Di Piero v. Commissioner
Docket No. 21967-85
United States Tax Court
T.C. Memo 1989-161; 1989 Tax Ct. Memo LEXIS 161; 57 T.C.M. (CCH) 71; T.C.M. (RIA) 89161; April 13, 1989; As amended April 17, 1989 David A. Schmudde and Martin M. Shenkman, *164 for the petitioners. Frank Agostino, C. Ellen Pilsecker, Matthew Magnone and Patrick E. Whelan, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1981 in the amount of $ 81,683.48, which stems from petitioners' investment in a movie partnership. The issues for decision are: (1) whether the partnership purchased the motion picture, "Conan the Barbarian"; (2) whether the partnership can include the nonrecourse purchase note in basis; (3) whether petitioners' investment is subject to the limitations of section 465; [1] (4) whether the partnership is entitled to use the double declining balance method of depreciation; (5) whether the partnership is entitled to deductions claimed on its 1981 return for miscellaneous expenses and for advertising expenses for the movies "Ragtime" and "Conan;" and (6) whether petitioners are liable for additional interest under section 6621(c). *165 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners, Domenic DiPiero and Rosera DiPiero, were residents of Red Bank, New Jersey at the time they filed their petition. Petitioners filed their Federal income tax return for the taxable year ending December 31, 1981, with the Brookhaven Service Center. All references to petitioner will be to Domenic DiPiero. Petitioner became a limited partner in December Associates in December 1981, by subscribing for one unit of a limited partnership interest. December Associates is a New York limited partnership formed to (a) acquire, own and exploit world-wide rights to the theatrical motion pictures, "Conan the Barbarian" ("Conan") and "The Last Safe Place" from Dino De Laurentiis (DDL), the producer, and (b) enter into a joint venture to render advertising services and fund advertising expenses in connection with the feature length theatrical motion picture entitled "Ragtime." "Conan" is a fantasy spectacle about a medieval mythical warrior written and directed by John Milius and starring Max Von Sydow, *166 James Earl Jones and Arnold Schwarzenegger. "Ragtime" is a movie adaptation of E. L. Doctorow's novel of the ragtime era of American history, starring James Cagney, Mary Steenburgen and Brad Dourif. The screenplay was written by Michael Weller and the film was directed by Milos Forman. The general partners of December Associates were Ira N. Smith and Stephen R. Greenwald. Both men are attorneys, and the confidential private placement memorandum (placement memorandum) commented that each "had limited experience in managing partnerships that own motion pictures and have had limited experience in rendering legal advice to partnerships with respect to motion picture matters." The partnership units were being offered for sale by the partnership through LPS Securities, Inc., an affiliate of Stephen R. Greenwald, on a best efforts basis to a select group of investors who met the suitability standards set forth under "Who Should Invest." In exchange for this service, LPS Securities would receive a due diligence fee of $ 5,000 and a nonaccountable expense allowance of $ 80,000. The placement memorandum dated November 5, 1981, stated that 55 units of partnership interests were available *167 at $ 160,000 per unit and the capital contributions of the limited partners would be due as follows: Per Unit
For 55 Units
On the date of executing
$ 26,000
$ 1,430,000
their subscriptions (together
with promissory notes evi-
dencing the subsequent annual
installments)
On March 1, 1982
34,000
1,870,000
On January 15, 1983
58,200
3,201,000
On January 15, 1984
41,800
2,299,000
$ 160,000
$ 8,800,000
This price was later reduced to $ 150,000 by a supplement to the private placement memorandum by lowering the January 15, 1984 payment to $ 31,800. [2]
The proceeds from sales of the partnership units were to be utilized as follows: Percent of Gross
Proceeds from
Amount
Sale of Units
GROSS PROCEEDS FROM SALE
OF UNITS [1]
$ 8,900,000
100.0%
LESS: Offering Expenses,
including legal
fees and disburse-
ments and $ 85,000
payable to LPS
Securities, Inc.
1,060,000
11.9%
NET PROCEEDS FROM SALE
$ 7,840,000
88.1%
Use of Net Proceeds
General Partners' Fee
615,000
6.9%
Cash Payment for
Purchased Pictures
1,650,000
18.5%
Marketing Costs for
Purchased Pictures
1,340,000
15.1%
Marketing Consultant
Fee [2]
740,000
8.3%
Working Capital
5,000
.1%
Advertising Costs
for Ragtime
1,400,000
15.7%
Loan Placement Fee
80,000
.9%
1982 Interest on
Purchase Notes
2,010,000
22.6%
*168 The following is a more detailed summary of the compensation to be paid to the general partners and certain others in connection with this transaction: ENTITY RECEIVING
ESTIMATED
COMPENSATION
TYPE OF COMPENSATION
AMOUNT
Offering Stage
LPS Securities,
Due Diligence Fee
$   5,000
Inc., an Affiliate
of Stephen R.
Greenwald, a
Non-Accountable
$  80,000
General Partner
Expense Allowance
Operating Stage
General Partners
Management Fee
$ 615,000
Present and continuing
Uncertain
2% interest in profit and
losses
Liquidation Stage
General Partners
Return of Capital Contribution
$ 100,000
after Limited Partners receive
their aggregate Capital Contributions
2% interest in balance of
Uncertain
proceeds after Limited Partners
receive their aggregate Capital
Contributions and General
Partners receive their Capital
Contributions
Compensation to Others
R. A. Inbows, Ltd.
Marketing Consultant Fee
$ 740,000
an affiliate of
Ira N. Smith,
a General Partner
*169 The placement memorandum indicated that an investment in the partnership might not be suitable for investors whose marginal income tax bracket was less than 50 percent. The partnership adopted as a general investor suitability standard the following requirements: (a) He is acquiring the Units for investment and not with a view to resale or distribution; (b) he can bear the economic risk of losing his entire investment; (c) he has a net worth of at least $ 400,000 multiplied by the number of Units to be purchased by him in the Partnership * * * and anticipates he will continue to have in the future, annual taxable income, some portion of which will be subject to a Federal income tax rate of at least 50% after taking into consideration any losses which may result from this investment; (d) his overall commitment to investments which are not readily marketable is not disproportionate to his net worth, and his investment in the Units will not cause such overall commitment to become excessive; * * * (f) he * * * have [sic] such knowledge and experience in financial and business matters that he is * * * capable of calculating the merits and risks of this investment. Each *170 investor was required to represent in writing the satisfaction of the foregoing requirements. Pursuant to the confidential placement memorandum the partnership was expected to acquire "Conan" from DDL for a purchase price of $ 25 million of which (a) $ 1 million cash would be payable at closing and another $ 250,000 would be payable on or before May 1, 1982; (b) $ 15,800,000 would be payable by delivery of a recourse purchase note bearing nonrecourse interest at the rate of 15 percent per annum and maturing on January 5, 1993; and (c) $ 7,950,000 would be payable by delivery of a nonrecourse purchase note bearing interest at the rate of 15 percent per annum and maturing on January 5, 1993. The purchase notes would be payable prior to maturity only from certain gross proceeds from exploitation of the picture, except that the partnership would be required to pay to DDL in 1982 the sum of $ 1,250,000 in interest on the "Conan" purchase notes. The partnership would grant DDL a security interest in the picture and certain proceeds from its exploitations. Each limited partner was required to assume the primary obligation to pay up to 1.78 percent of the principal amount of the "Conan" *171 recourse purchase note equalling a maximum liability of $ 281,240 per unit. The partnership was expected to acquire "The Last Safe Place" from DDL for a purchase price of $ 9 million of which $ 400,000 was in cash, $ 5,075,000 was by recourse note and $ 3,525,000 was by nonrecourse note. "The Last Safe Place" was not ultimately purchased by the partnership. For the $ 25 million dollars, the partnership would acquire title to and all rights in the purchased pictures in perpetuity throughout the world and in all media including theatrical, nontheatrical and television rights, subject to the distribution agreements, various subdistribution agreements and the reservation by DDL of certain ancillary rights including remake, sequel, made-for-television motion picture and series rights. In addition, the partnership would acquire various physical materials, including picture negatives, prints and necessary sound track material. The partnership share of gross receipts, or where applicable net profits, derived from the exploitation of the purchased movie "Conan" and the use of such monies by the partnership, were determined as set forth: 1. U.S. and Canadian Theatrical and Television *172 Distribution Partnership's
Partnership's
Gross Receipts
Percentage
Percentage Share
0 -          $ 10,000,000
5%
$  500,000
10,000,001 -   25,000,000
10%
1,500,000
25,000,001 -   45,000,000
12%
2,400,000
Over 45,000,000
6% (or 100% of Net
Profits, whichever
is greater)
2. Foreign Theatrical and Television Distribution 100% of Net Profits 3. Additional Television Proceeds If the Partnership earns less than $ 4,500,000 under A(1) and A(2) above through December 31, 1988, then the Partnership will be entitled to receive all remaining Television Proceeds up to an amount equal to such shortfall. 4. Additional Gross Receipts (a) The Partnership will also receive 95% of the first Gross Receipts until the Partnership has received an amount sufficient to repay the $ 1,000,000 Marketing Loan. (b) The Partnership will also be entitled to 100% of all remaining Gross Receipts until the amounts payable to the Partnership under this section A(4)(b) and section B(4) together aggregate $ 32,350,000. The placement memorandum also listed a 13-page summary of the risk factors associated with the investment. These included *173 tax risks, operating risks and investment risks. The tax risks included partnership status, risk of audit and disallowance of partnership deductions, status of the partnership as the sole owner of the purchased pictures and the relationship of DDL with the subdistributors, transactions entered into for profit, limitation on the deductibility of losses to the amount at risk, partnership deductions, depreciation of the purchased pictures and disposition of the purchased picture or a partnership interest, and the availability of investment tax credit and tax law changes among others. Operating risks included competition in the motion picture industry, limited partners' letters of credit and other collateral, the distribution agreement and advertising services contract, partnership funds at risk of credit of DDL, foreclosure and limited cash flow, as well as the completion of "The Last Safe Place" itself. Finally, investment risks included restrictions on transfer, conflicts of interest, no right to manage and liability of limited partners. The placement memorandum also included a 21-page section dealing with Federal, state and local tax consequences. Additionally, a 46-page tax opinion *174 available to the investors was completed by the law firm of Carro, Spanbock, Londin, Fass & Geller at the request of Ira N. Smith and Stephen Greenwald. The opinion stated, however, that no opinion would be rendered with respect to various Federal income tax matters where the law was unclear or which turned on issues of fact such as the allocation of partnership profits and losses, whether the transaction had been entered into for profit, and the fair market value of the pictures. Finally, the partners of December Associates also requested that the accounting firm of Laventhol & Horwath review a set of projected financial statements of the partnership including projected taxable income loss from 1981 to 1993, projected cash flow from 1981 to 1993 and the projected after-tax benefits for the $ 160,000 investor limited partnership interest in the 70-percent bracket for 1981 and a 50-percent bracket for 1982 to 1993. The review consisted of comparing the estimates and assumptions used for the placement memorandum, draft of the opinion of tax counsel as to the Federal income tax consequences and verification that the projections have been accurately compiled on the basis of such estimates *175 and assumptions. The confidential summary of offering for December Associates stated that the ratio of tax losses to net investment would be 5.06:1 for the year 1981; 4.07:1 for the year 1982; 4.43:1 for the year 1983; and 4.06:1 for the year 1984. No appraisal of prerelease estimates of revenue or expenses was done by professionals on behalf of the partnership or the general partners with respect to "Conan." The supplement listed the projected after-tax benefits for a $ 150,000 investor limited partnership interest in the 70-percent tax bracket in 1981 and 50 percent for thereafter as follows: GROSS RECEIPTS -- $ 45,000,000
Net
Cumulative
Net
Benefit, in
Taxable
Tax
Annual
cluding Fund
Income
Savings
Cash
Capital
(Investment)
Generated
Year
(loss) [1]
(cost)
Distribution
Contribution [3]
Benefit
Thereon [2]
1981
(130,423)
91,296
26,000
65,296
65,296
1982
(139,408)
69,704
35,303
34,401
104,921
1983
( 77,494)
38,747
52,063
69,450
21,360
134,674
1984
(136,485)
68,243
5,513
43,195
30,561
176,009
1985
( 16,601)
8,300
3,063
11,363
201,453
1986
3,063
(1,532)
3,063
1,531
219,100
1987
236,628
1988
255,559
1989
121,275
(60,638)
24,500
(36,138)
239,865
1990
121,275
(60,638)
24,500
(36,138)
222,917
1991
121,275
(60,638)
24,500
(36,138)
204,612
1992
138,596
(69,298)
24,500
(44,798)
176,183
*176 By means of a purchase and sale agreement dated December 30, 1981, the partnership purported to purchase "Conan" from DDL for $ 25 million. The record contains no evidence that cash payment was made. At the same time the partnership purchased "Conan," the partnership was obligated to enter into a distribution agreement (the distribution agreement) with DDL. Generally, the distribution agreement would grant DDL for an initial term of 10 years the exclusive right to exploit and purchase pictures in all media throughout the world and the *177 right at its option to extend the term of the distribution agreement for two successive terms of 10 years and 20 years, respectively, with certain additional options to review in perpetuity if the gross receipts for "Conan" exceeded $ 50 million. For this option right, DDL would pay the partnership the sum of $ 100,000. "Conan" and "Ragtime" were produced by DDL. Pursuant to the distribution agreement, DDL was to possess: the sole exclusive and irrevocable right throughout the world * * * to advertise, publicize and exploit, and to cause to be advertised, publicized and exploited, the Picture in such manner and through such means and media whatsoever as Distributor may determine, including, but not limited to, theatrically and non-theatrically, and by means of television in all forms, whether now known or hereafter to be known, and by means of wire, cartridges, cassettes, and any and all other means of projection, transmission, broadcasting and exhibitions together with to the extent acquired by Producer, (a) exclusive publication, performing, synchronization and all other rights in all unpublished music compositions written for or used in connection with the Picture and *178 (b) all right to use and exploit the sound tract of the Picture for phonograph records, tapes, transactions or any other form or medium of any nature whatsoever, for the term limited to a period * * * of ten years from the date hereof provided however, that Distributor shall have the following options * * * to extend such Initial Term and acquire the rights granted to Distributor hereunder for three additional successive terms. [Emphasis added.] Thus, DDL reserved remaking sequel rights, rights to state production merchandising, literary rights in radio and television rights to "Conan." DDL was given complete discretion and authority to edit or modify the picture. DDL agreed to deliver "Conan" to the partnership no later than December 31, 1981. The copyright to "Conan" was to be retained in DDL's name, but the negative to the film was to be transferred to the partnership. The partnership received no absolute verification concerning the picture's negative costs prior to December 30, 1981. DDL was given a security interest in the partnership's rights in order to secure payment of the purchase price. The partnership assigned interests in the films copyrighted to DDL as security *179 for the purchase right and the partnership interest in the film was subject to prior agreement to pay unspecified amounts to third parties. The partnership was, however, to receive from film proceeds in an amount sufficient to repay the $ 650,000 marketing loan, and payment of the purchase notes was to be made from the film proceeds. The partnership was to receive 100 percent of net foreign proceeds from "Conan" as used in the distribution agreement. The definition of net proceeds set forth in the distribution agreement required DDL's domestic gross receipts to exceed $ 87,500 in order to generate the first dollar of net proceeds. The distribution agreement guaranteed that the partnership would receive $ 1 million and that the purchase notes would be paid out of film proceeds. Specifically, paragraph 12(e) of the distribution agreement between December Associates and DDL provided: In the event that, on or before November 30, 1983, Distributor has not paid to the Producer, pursuant to the provisions of Sections 8(a), 9 and 12(d), at least $ 1,000,000, then on November 30, 1983, Distributor shall pay to Producer as an advance against future payments due to Producer under Sections *180 8(a) and 9, an amount equal to the difference between $ 1,000,000 and the amount paid to date pursuant to Sections 8(a), 9, and 12(d). Distributor may recoup the amount of such advance without interest from future payments due to the Producer under paragraphs 8(a) and 9. The distribution agreement provided for a 10-year deferral for payment of gross receipts, and certain percentages of the gross receipts due the partnership were not to be paid as earned but could be held by DDL until as late as February 28, 1992. DDL was to have the exclusive rights to advertise "Conan" throughout the world, and DDL agreed to spend or cause to be spent for its own account marketing costs of almost $ 1,150,000. Also pursuant to the distribution agreement, the partnership was obligated to provide to DDL the nonrefundable amount of $ 1,500,000 for the advertising of "Conan" to enhance the successful exploitation of the purchased pictures. These costs were to be incurred in 1981 and 1982. Of this sum, the partnership would borrow $ 1,000,000 from N.V. Slavenburg's Bank or another lending institution. The marketing loan was to be nonrecourse. By a supplement to the memorandum, the marketing and *181 advertising costs were reduced to $ 1,150,000. In connection with the advertising of the movie, December Associates would also pay a distribution consulting fee of $ 500,000 payable to R. A. Inbows, Ltd. for consulting services to the partnership in connection with the release and distribution of the movies. R. A. Inbows, Ltd. is an affiliate of one of the general partners. By a supplement to the memorandum, this was $ 240,000 lower than the fee listed in the placement memorandum. The distribution of "Conan" was subject to a subdistribution agreement with Universal Pictures for the theatrical distribution rights to such distributor in the United States and Canada. The acquisition of "Conan" was also subject to various foreign subdistribution agreements, including an agreement with Twentieth Century-Fox Pictures, which were entered into prior to the partnership's purchase of "Conan" and which the partnership was obligated to abide by as a requisite to purchasing the movie. Specifically, on June 4, 1979, DDL and Universal Pictures entered into a Pickup Distribution Agreement with respect to "Conan." Pursuant to the agreement, Universal agreed to lend DDL the sum of $ 9,500,000 *182 to be used to finance the film, and DDL would not be obligated to repay the loan provided that it delivered the completed film to Universal in accordance with the agreement. In order to secure repayment of the $ 9,500,000 loan, DDL assigned Universal all its rights, title and interest in the film, its copyright and all associated rights. The rights granted to Universal were irrevocable. The distribution agreement also granted Universal the perpetual right to distribute the film theatrically in the United States and Canada. In consideration for the rights granted to Universal, Universal paid DDL $ 10 million to be made upon the delivery of the film. The Pickup Distribution Agreement allowed DDL to receive an amount equal to 50 percent of gross profits and proceeds in excess of $ 25 million. Dino De Laurentiis had no obligation to advance advertising funds to Universal. On June 25, 1980, DDL, as producer, and Twentieth Century-Fox International Corporation, as distributor, entered into an acquisition distribution agreement with respect to "Conan." Twentieth Century-Fox obtained distribution rights to "Conan" in countries other than the United States, Canada, Germany and Austria *183 for a perpetual period. The Twentieth Century-Fox distribution agreement entitled DDL to 50 percent of gross proceeds in excess of $ 20 million. DDL was entitled to a minimum guaranteed payment of $ 7,500,000 under the Twentieth Century-Fox distribution agreement. This minimum guaranteed amount was to be paid in full on or before the date of delivery of the film. This subdistribution agreement between DDL and Twentieth Century-Fox with respect to "Conan," although somewhat high, was in line with industry standards. Moreover, the relatively high price paid by Twentieth Century-Fox to secure foreign theatrical distribution was reasonable in light of the potential profits of "Conan" abroad as "Conan" had an enormous overseas profit potential. The standard break-even point during 1980 through 1981 was approximately 2-1/2 to 3 times negative costs. As a general rule, the motion picture generates most of its theatrical gross receipts within 3 to 5 years of its release, but a motion picture may generate gross receipts for an indefinite period. As of December 31, 1985, domestic gross receipts from "Conan," upon which partnership percentages were based, totaled $ 32,751,394. The partnership's *184 cumulative share of gross receipts from "Conan" was $ 2,930,167 as of December 31, 1981. With respect to "Ragtime" Paramount was granted the sole and exclusive right to advertise, publicize, promote and exploit "Ragtime," a right which was conveyed by DDL to Paramount Pictures on April 10, 1981. For this right, Paramount agreed to pay DDL $ 7 million plus $ 1 million for verified distribution and publicity expenses. DDL was to receive 50 percent of the theatrical gross proceeds in excess of $ 20 million. December Associates and DDL entered into an advertising services agreement dated as of November 10, 1981. The advertising agreement stated that DDL had the right to distribute the movie "Ragtime," and pursuant to it, DDL was to create an advertising campaign for the movie. The partnership was to make itself available for consultation and to perform certain administrative duties in connection with the advertising program. In this connection, the partnership was to spend $ 2,400,000 to carry out its obligations, a reduction from $ 4,200,000 as listed in the offering memorandum. The $ 2,400,000 would consist of $ 1,400,000 from partnership capital contributions and $ 1,000,000 *185 from the proceeds of a nonrecourse bank loan. The advertising agreement provided that the partnership was to receive the following percentages of "Ragtime's" gross proceeds: (a) 5 percent of the first $ 28 million, (b) 10 percent of the next $ 7 million and (c) 6 percent of all amounts in excess of $ 35 million. The $ 1 million loan to be obtained by the partnership in connection with the advertising agreement was to be repaid from film proceeds. If the percentages of gross proceeds payable to the partnership did not reach $ 2,100,000 by December 31, 1983, DDL was to pay to the partnership the difference between $ 2,100,000 and the percentage previously earned. Specifically, paragraph 4.4 of the advertising services agreement provides: 4.4 If by December 31, 1988, the amount earned by Associates, whether paid or not, under Subsection 4.1 is not equal to at least $ 2,100,000, then Distributor shall pay Associates twenty-one percent (21%) of Gross Receipts from all territories up to an amount equal to the difference between $ 2,100,000 and the amounts theretofore earned by Associates under subsection 4.1. This feature of the advertising services agreement was explained to the *186 limited partners as follows: Pursuant to the "RAGTIME" joint venture agreement, the Partnership will receive a percentage of the "gross receipts" from world-wide theatrical distribution and nontheatrical distribution. In addition, if the percentage of the Partnership's gross receipts is insufficient to generate a return of not less than 150% of the cash invested in the joint venture, the Partnership will be entitled to 100% of world-wide theatrical gross up to $ 2,100,000 to make up any deficit. A report provided by Paramount indicated that of the $ 1,708,276 of "Ragtime" media advertising expenditures, DDL had advanced $ 1,700,000 and Paramount had advanced $ 8,276. December Associates claimed the following deductions on its 1981 Form 1065 return: Advertising
$ 2,906,500
Guaranteed payments to partners
10,250
Amortization
167
Tax Advice
15,000
Distribution Consulting Fees
500,000
(R. A. Inbows)
Bank Charges
4
Professional Fees
27,500
Total
$ 3,459,421
On his 1981 Federal income tax return petitioner reported a loss from his interest in December Associates of $ 163,367. OPINION We must first determine whether December Associates *187 purchased an ownership interest in the motion picture "Conan." Respondent contends that the partnership does not possess sufficient attributes of ownership to be considered the owner of the motion picture. Petitioners argue to the contrary. It is well established that the economic substance of a transaction rather than the form in which it is cast is determinative of its consequences. See Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and the cases cited therein. Whether the partnership became the owner of "Conan" for tax purposes as a result of the transactions involved herein is a question of fact to be determined by reference to the written agreements read in light of the attending facts and circumstances. Tolwinsky v. Commissioner,86 T.C. 1009, 1041 (1986); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). A sale occurs upon the transfer of the benefits and burdens of ownership rather than upon satisfaction of the technical requirement for passage of title under state law. Grodt & McKay Realty, Inc. v. Commissioner, supra.In many *188 cases, the courts have refused to permit the transfer of legal title to shift the incidence of taxation attributable to ownership of the property where the transferor continues to retain significant control over the property transferred. See Helvering v. Clifford,309 U.S. 331 (1940); Helvering v. F. & R. Lazarus Co.,308 U.S. 252 (1939); Durkin v. Commissioner,87 T.C. 1329 (1986); Tolwinsky v. Commissioner, supra at 1009; Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982). "Taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed -- the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 387 (1930). "It is therefore fundamental that the availability of the depreciation deduction is not predicated on the mere holding of legal title to property but rather upon a capital investment in the property." Gladding Dry Goods v. Commissioner,2 B.T.A. 336 (1925). For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial *189 rights of value in the motion picture copyright. See Bailey v. Commissioner,90 T.C. 558, 607 (1988); Tolwinsky v. Commissioner, supra at 1042-1043. A sale has not occurred if the transferor retains proprietary rights in the motion picture. A motion picture copyright includes the exclusive rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display to the public still photographs taken from the motion picture. 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective January 1, 1978). A review of the record convinces us that December Associates never acquired the benefits and burdens of ownership of "Conan." Pursuant to the purchase and sale agreement, the partnership acquired all of DDL's (the seller's) right, title and interest with respect to the ownership and exploitation throughout the world of "Conan" for $ 25 million. Pursuant to that same purchase and sale agreement, however, the partnership was required to simultaneously execute *190 a distribution agreement with DDL. The offering materials make clear that the possibility of entering into either the purchase and sale or the distribution agreement alone was not contemplated. The distribution agreement in fact transferred all the basic rights associated with the copyright to DDL leaving December Associates with a mere "bare copyright." [3] Thus, DDL reserved remaking sequel rights, theatrical stage rights, all merchandising revenues, book publishing rights, all series in television and radio rights for its own accounts. Moreover, the copyright in "Conan" remained in DDL's name. Additionally, DDL obtained complete control over the exploitation of the picture. The distribution agreement expressly stated that it was the parties' intention that DDL should "have the broadest possible latitude in the distribution of the Picture." DDL alone was authorized to edit, retitle, advertise, distribute or sell the picture. Such a combination of rights constitute virtually the entire bundle of rights that is a copyright. Durkin v. Commissioner,87 T.C. at 1369; Tolwinsky v. Commissioner, supra at 1009. By means of the distribution agreement, *191 DDL regained virtually every right it allegedly transferred to the partnership under the purchase agreement. It is questionable, in fact, whether DDL had any rights to transfer to December Associates as it would appear from the record that DDL had already previously transferred all substantial rights to the movie to other distributors. There is no evidence, therefore, that the partnership had any control over the exploitation of the motion picture in any way, shape or form. See Durkin v. Commissioner,87 T.C. at 1369-1370. In fact, the agreement made clear that the partnership was not entitled to take any action. The sole contribution to be made by the partnership was financial. The distribution agreement also provided for these rights to be in effect "perpetually." Under the distribution agreement, there was an initial distribution period of 10 years, and the option to acquire the rights pursuant to the agreement for two additional successive terms, and then effectively in perpetuity. DDL was "deemed" to have exercised the option if the partnership did not hear to the contrary at least *192 30 days prior to the expiration of each such term. DDL purported to convey ownership of "Conan" while in fact retaining exclusive control over all of the movie "Conan," effectively for perpetuity by means of the distribution agreement. Finally, while the distribution agreement further provided for the allocation of the gross receipts earned from the exploitation of the film, at best, the partnership was to receive 6 percent of domestic gross theatrical proceeds in excess of $ 45 million and was to have the purchase notes paid from the film proceeds. Additionally, the agreement provided for the distributor to defer substantial portions of amounts due to December Associates for substantial periods of time up to approximately 10 years. However, the useful life of most films is 3 to 5 years. This, too, indicates that December Associates was not the actual owner of the movie. Our conclusion that DDL, rather than December Associates, is the true owner of "Conan" does not require us to view the transaction as one which is wholly lacking in economic substance and which must therefore be disregarded for Federal tax purposes. Rather, we view this transaction as one in which the partnership *193 acquired an intangible contractual right to participate in the distributable gross receipts generated by the film, which is a depreciable interest and recognized for Federal tax purposes. However, because DDL is the actual owner of the film for Federal tax purposes, December Associates cannot claim depreciation on the film. As was stated in Bailey v. Commissioner,90 T.C. at 614, where a movie partnership was also found not to be the true owner of the movie purchased: The only interests acquired by the partnerships were a contingent participation in the distributable gross receipts of Columbia's distribution efforts for each film. The cash investments by the partnerships reduced Columbia's financial risk in the films, but such payments, without more, do not give the partnerships depreciable interests in the film. We must next consider whether the partnership can include the nonrecourse promissory note in basis. The nonrecourse promissory note given by December Associates to DDL was payable only out of a portion of the receipts generated by the motion picture. Generally, when debt principal is paid solely out of exploitation proceeds, nonrecourse loans are contingent *194 obligations and are not treated as true debt. Durkin v. Commissioner,87 T.C. at 1376; Estate of Baron v. Commissioner,83 T.C. 542, 550-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Once we have determined that the partnership only had an income interest in the exploitation receipts from the motion picture, the debt does not reflect an actual investment in property, cannot be included in the taxpayer's depreciable basis and must be disregarded for tax purposes unless and until paid. The next issue for decision is whether petitioner may be considered at risk within the meaning of section 465 with respect to his share of the debt obligation of the "Conan" transaction. Section 465, among other things, provides that where an individual invests in motion picture films or television video tapes, any loss for the taxable year should be allowed only to the extent the taxpayer is at risk with respect to the obligations of the activity at the close of the taxable year. Sec. 465(a)(1) and (c)(A). Included in the amount considered at risk are amounts of cash contributed by the taxpayer with respect to the activity, sec. 465(b)(1)(A), and amounts *195 borrowed if the taxpayer is personally liable for repayment of the borrowed amounts or has pledged property other than the property used in the activity as security for the borrowed amounts. Sec. 465(b)(2). Investors will be regarded as personally liable for such obligations pursuant to section 465(b)(2)(A) if they are economically liable to repay the obligations in the event funds from the investment activity cannot do so. In the instant case, no unrelated property was pledged by petitioner as security for the borrowed amount. Petitioner, therefore, will be considered at risk with respect to the recourse note only if he was genuinely personally liable for the amounts due thereunder. Section 465(b)(3)[4] imposes a limitation with respect to amounts investors will be considered at risk. Under that section, investors will not be considered at risk for debt obligations for the investment activity if the amounts borrowed are borrowed from a person who has a continuing interest in the activity other than as a creditor. *196 Section 465(b)(4)[5] imposes a further limitation. That section provides that investors will not be considered at risk for their debt obligation if their ultimate liability is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Section 465(b)(4), particularly the "similar arrangements" language, evidences concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. See Larsen v. Commissioner,89 T.C. 1229 (1987); Follender v. Commissioner,89 T.C. 943 (1987); Melvin v. Commissioner,88 T.C. 63, 75 (1987). Respondent argues that the limited partners of December Associates are not at risk pursuant *197 to the limitations of section 465(b)(3) and (b)(4). Respondent contends that the promissory note entered into with DDL cannot be treated as an amount at risk because DDL has an interest in the activity other than as a creditor. Respondent contends further that the financial arrangements of the transaction made sure that the partnership would be returned its cash investment and guaranteed that the limited partners would never have a genuine liability to pay the nonnegotiable cash promissory note. Thus, the partners' investments were not subjected to the vagaries of the motion picture market either in an economic or a tax sense. Petitioner, not surprisingly, contends that DDL did not have an interest in the movie other than as a creditor and the amounts contributed were not protected against loss. The payments of these amounts were subjected to the usual business contingencies such as bankruptcy or default on the payments. Additionally, it is pointed out that repayment was not sufficient to completely pay the notes, thus it only provided some guarantee that a portion of the notes would be paid. We address each in turn. Respondent argues that the limited partners of December *198 Associates cannot treat their pro rata shares of the nonnegotiable promissory note as an amount at risk because it was borrowed from a creditor with an interest in the activity other than as a creditor. Section 465(b)(3) excludes from the "at risk" category amounts for or from a person who has an interest in the subject activity in a capacity other than as a creditor. Sec. 465(b)(3). Respondent's position is set forth in section 1.465-8(a), Proposed Income Tax Regs., which addresses the subject of an interest other than that of a creditor under section 465(b)(3)(A). That proposed regulation provides, in part, that "amounts borrowed with respect to an activity will not increase the borrower's amount at risk in the activity if the lender has an interest in the activity other than that of a creditor. This rule applies even if the borrower is personally liable for the repayment of the loan or if the loan is secured by property which is not used in the activity." Subsection (b) provides that "the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest *199 in the net profits of the activity." (Emphasis added.) Sec. 1.465-8(b)(1), Prop. Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979).[6] Capital interest is defined as "an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity." Sec. 1.465-8(b)(2), Proposed Income Tax Regs. An interest in the net profits is defined as "any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity." Sec. 1.465-8(b)(3), Prop. Income Tax Regs. With respect to section 465(b)(3), the language "interest (other than as a creditor)" is not defined in section 465 or the committee reports accompanying the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, which enacted section 465. The Joint Committee's General Explanation of the Tax Reform Act of 1976, however, states: Persons having an interest in the activity include, in the case of a partnership, *200 all other partners and any other person (such as a promoter or selling agent) who stands to receive financial gain from the activity or from the sale of interests in the activity. * * * [1976-3 C.B. (Vol. 2) 1, 51; emphasis added.] This indicates that any financial interest (other than as a creditor) would be a prohibited "other interest" under section 465. See Bennion v. Commissioner,88 T.C. 684, 695-697 (1987). Respondent first argues that if we conclude as we have that December Associates acquired at best an intangible contractual right to the future profits of DDL's exploitation of "Conan," for tax purposes, DDL, and not the partnership, is the true owner of the film. DDL, therefore, stands to receive the bulk of the financial gain from the activity and has an interest in the film other than as a creditor. In light of the small downpayment made by the partnership, respondent continues, and the rapidly depreciating nature of the underlying assets, DDL, and not the partnership, would receive the bulk of the *201 proceeds on the liquidation of the activity. By definition therefore, respondent concludes that DDL has a capital interest in the activity. Sec. 1.465-8(b)(2), Prop. Income Tax Regs. Respondent continues that DDL also has an interest in the net profits of the activity. Respondent points out that paragraphs (8) and (9) of the distribution agreement between the partnership and DDL govern the allocation of gross receipts derived from the exploitation of the film. In general terms, the agreement purports to provide the partnership with 100 percent of both United States and foreign net profit proceeds after break even. However, the form used to compute net proceeds virtually guaranteed that at any level of gross receipts there would be no net proceeds and that the partnership interest in the activity is limited to 6 percent of the United States gross proceeds after break even and none of the film foreign receipts. Thus, DDL in reality had an interest in the net proceeds of the activity. Petitioners argue that DDL as creditor of the recourse purchase notes did not have an interest other than as a creditor. Petitioners point out that the agreements clearly indicate that DDL had a *202 mere gross profits interest in the outcome in the distribution of the motion picture which is not equivalent to a net profit interest. Additionally, the amounts were not loaned between partners or between joint ventures. Thus, DDL, as a mere creditor, would not hold a prohibited interest in the activity. We agree with respondent. We have utilized the capital interest and interest in the net profits tests as guidelines to determine whether any of the creditors in a transaction have prohibited other interests. Levy v. Commissioner,91 T.C. 838 (1988); Larsen v. Commissioner,89 T.C. 1229, 1270 (1987); Bennion v. Commissioner,88 T.C. 684, 696 (1987); Jackson v. Commissioner,86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). A capital interest is described in the proposed regulations as an interest in the assets of an activity which would make the assets, or a portion thereof, distributable to the owner of the interest upon liquidation of the activity. Sec. 1.465-8(b)(2), Prop. Income Tax Regs. Because we have determined that DDL is the actual owner of the movie, DDL clearly had a *203 capital interest in "Conan." With regard to the net profits test, an interest in the net profits of an activity may exist even though the lender does not possess any incidents of ownership in the activity. In the instant case, DDL has been deemed the actual owner in "Conan," see Bennion v. Commissioner, supra at 698, and in a true sense, has an interest in the net profits of the activity. Section 465(b)(3) contemplates fixed and definite rights or interests that realistically may cause creditors to act contrary to how independent creditors would act with respect to their rights under the debt obligations in question: Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto. [Bennion v. Commissioner, supra at 698.] For the reasons stated, we conclude that DDL's interest in the movie *204 constitutes a continuing interest in this transaction other than as a creditor. Having so found, the provisions of section 465(b)(3) have been violated by this transaction, and petitioner cannot be considered at risk for the amount of the recourse promissory notes. We next consider the additional argument set forth by respondent pursuant to section 465(b)(4), as pertaining to the cash contributions made by the limited partners. Section 465(b)(4) concerns itself with arrangements where taxpayers are not really "at risk" because they are immunized from suffering an economic loss even though the underlying transaction is not profitable. See Porreca v. Commissioner,86 T.C. 821, 838 (1986). The Senate Finance Committee report explains as follows: Also, under these rules, a taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other *205 compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person. [S. Rept. 94-938, at 49 (1976), 1976-3 C.B. (Vol. 3) 49, 87; fn. ref. omitted.] The Senate Finance Committee report continues that: for purposes of this rule * * * the possibility that the party making the guarantee * * * will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938, at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88 n.6.] Respondent points to several clauses in the various agreements which highlight that the partners were guaranteed the return of their cash investment in the picture and the advertising costs, specifically paragraph 12(e) of the distribution agreement and paragraph 4.4 of the advertising services agreement. December Associates' actual "cash investment" in "Conan" was $ 1,250,000. *206 The partnership was also to provide DDL with $ 1,400,000 pursuant to the advertising services agreement. Respondent contends that amounts necessary to satisfy the cash investment were in the possession of DDL prior to the partnership's execution of the "Conan" note because on the date that the advertising services agreement was executed, DDL had "distribution advances paid or owing to it from third party subdistributors" of $ 14,495,000 with respect to "Ragtime." Respondent contends, therefore, that the relevant facts are: 1) December Associates' cash investment in both motion pictures was $ 2,650,000 and 2) on the date that December Associates executed the purchase and sale, distribution and advertising services agreements, the partnership was guaranteed a return of $ 3,100,000. Consequently, respondent concludes that the limited partners of December Associates were protected against the loss of their cash investment. Sec. 1.465-6(a), Prop. Income Tax Regs.; Capek v. Commissioner,86 T.C. 14 (1986). We find that petitioners were protected against the economic loss of their investment by means of the agreements they entered into. Several cases have found that *207 taxpayers who are protected from economic loss will not, for purposes of section 465(b)(4), be considered at risk. See Porreca v. Commissioner,86 T.C. at 821; Capek v. Commissioner, supra;Brand v. Commissioner,81 T.C. 821 (1983). As a general rule, a taxpayer is considered at risk for the amount of money he has contributed to the activity. Sec. 465(b)(1). Section 465(b)(4), however, is applicable to cash contributions as well as amounts borrowed. While most of the cases we have reviewed have dealt with amounts borrowed, we are not limited in our holding because it is clearly in accord with the legislative history of section 465(b)(4). In the instant case, petitioner put up funds which were guaranteed to be repaid within a specific time period. The terms of the agreements were clear on this matter. In fact, petitioner concedes this by arguing: that the existence of pre-existing agreements to receive payment are sufficient to create this protection against loss. The prior existence of a contract with a television network would provide substantial economic benefits to the partnership. But, this does not guarantee payment of the *208 notes or operate as a protection against loss. The payment of these amounts was subject to the usual business contingencies. The payor could encounter bankruptcy or could default on the payments. In addition, the prepayment was insufficient to completely pay the notes. Thus it only provided some guarantee that a portion of the notes would be paid. The contingencies listed by petitioner are not to be considered "risks" if and until they occur. See Capek v. Commissioner,86 T.C. at 52-53; sec. 1.465-6(c), Prop. Income Tax Regs. Moreover, the partial guarantee was adequate to cover the cash portion of the investment, our focus. The cash contributions are not at risk pursuant to section 465(b)(4). We next determine whether December Associates is entitled to use the declining balance method of depreciation. On its returns, the partnership used the double declining balance method to compute its depreciation deduction. We have determined that December Associates purchased a contractual right in "Conan," and not the motion picture itself. The contractual right to participate in a motion picture's gross receipts is an intangible asset. See Law v. Commissioner,86 T.C. 1065, 1098, 1109 (1986); *209 Tolwinsky v. Commissioner,86 T.C. 1009, 1046, 1053 (1986). The declining balance method may not be used to depreciate intangible property. Sec. 167(c). Generally, a change in the taxpayer's depreciation method constitutes a change in the taxpayer's method of accounting, which normally requires the Commissioner's consent. Sec. 446(e); sec. 1.167(e)-1, Income Tax Regs. However, such consent is not required if the taxpayer's chosen method of depreciation is found to be unacceptable, and then he seeks to adopt the straight-line method. Sec. 167(e)(1); sec. 1.167(b)-1 and (e)-1, Income Tax Regs. December Associates' depreciation method is unacceptable because it did not purchase a motion picture (a tangible asset), but an intangible contractual right to share in future profits. Respondent argues that the partnership must use the straight-line method. Petitioner offers no alternative. Neither party suggests that the partnership employ the income forecast method. [7] Thus, the straight-line method must be used to calculate the partnership's depreciation deduction. See Durkin v. Commissioner,87 T.C. 1329 (1986); Law v. Commissioner, supra. *210 The straight-line method is applicable to intangible properties. See sec. 167. We must next consider whether the partnership's miscellaneous expenses and expenses paid for advertising services in connection with the distribution of the film "Ragtime" and "Conan" are fully deductible as reflected on the 1981 return. In his notice of deficiency, respondent disallowed the amounts in question. Petitioners bear the burden of proof as respondent's determination is presumptively correct. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Petitioners offered no testimony at trial to explain or substantiate these amounts. Furthermore, the documents do not reflect that any of the amounts were actually paid, or if paid, that they were *211 paid during 1981. Petitioners failed to offer any proof as to the deductibility of the enumerated expenses and, accordingly, are not entitled to deduct any portion of the claimed expenses. In this regard, the $ 2,906,000 deducted by December Associates for advertising services should be disallowed. As respondent points out, the partnership purportedly paid $ 2,400,000 to DDL to market the motion picture "Ragtime," but DDL was not the distributor of "Ragtime" nor did it have any obligation to expend, market, advertise or distribute "Ragtime." Rather, DDL had entered into an agreement with Paramount for such services which provided: Without limiting the generality of PPC's distribution rights as set forth hereinabove, PPC shall have the sole and exclusive right to advertise, publicize, promote and exploit the Picture in any and all media whether now known or hereafter devised within the Territory. The agreement further provided that Paramount was responsible for the cost of distribution. Accordingly, it is unlikely that the partnership or DDL incurred any marketing or advertising expenses with respect to "Ragtime" in 1981, and no testimony substantiating this deduction was *212 offered. Finally, the agreement provided for $ 2.4 million in services, and no reason is given for $ 2.9 million in advertising deductions, unless certain "Conan" unsubstantiated expenses are also included. This Court has reviewed a similar advertising service agreement. In Isenberg v. Commissioner,T.C. Memo. 1987-269, we concluded that the partnership was financing the advertising and not itself incurring advertising expenses. The same situation would appear to be present in the instant case where Paramount was already obligated to finance and promote the advertising yet the partners took the immediate deduction. The sole purpose of the advertising services arrangement between the partnership in DDL was to provide the partnership with an immediate up-front deduction, and the deduction must therefore be disallowed. [8] We also must disallow the $ 500,000 deduction expense to R. A. Inbows under this same rationale. Finally, we must determine whether petitioner should be subject to the additional interest under section 6621(c) of the Code. Section 6621(c) provides for an increase in *213 the rate of interest to 120 percent of the otherwise applicable annual rate with respect to a substantial underpayment (an underpayment of at least $ 1,000) attributable to one or more tax-motivated transactions. Sec. 6621(c)(1). Additional interest accrues after December 31, 1984, regardless of the filing of the date of returns. DeMartino v. Commissioner,88 T.C. 583, 589 (1987). Section 6621(c)(3)(A)(ii) expressly defines the term "tax-motivated transaction" to include any loss disallowed by section 465(a). For this reason, the underpayments resulting from such disallowed deductions are attributable to tax-motivated transactions. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The primary reason for the revision in the offering was the uncertainty regarding the completion of production and release date of "The Last Safe Place." The movie was not ultimately purchased.↩
1. Includes $ 100,000 contributed by General Partners. ↩
2. Payable to R. A. Inbows, Ltd., an affiliate of Ira N. Smith, one of the General Partners, in consideration for consultant services to be rendered to the Partnership in connection with the release, distribution and marketing of the Pictures, particularly in the exercise of the Partnership's rights of consultation under the distribution agreements.↩
1. Taxable income (loss) is computed for an individual taxpayer based upon the "at risk" provisions of Section 465 of the Internal Revenue Code↩. 3. Includes interest on limited partners' capital contribution of $ 1,303 in 1982, $ 11,250 in-1983, and $ 11,395 in 1984. Interest calculations assume a rate of 1% over a prime of 19% or a total of 20%. As of December 22, 1981, prime was quoted at 15-3/4%. To the extent prime remains below 19%, interest expenses on capital contributions will be correspondingly reduced.↩
2. Assuming taxpayer invests total net investment benefits or other properties yielding 8% after taxes. ↩
3. See Isenberg v. Commissioner,T.C. Memo. 1987-269↩.
4. Section 465(b)(3) provides as follows: (b) AMOUNTS CONSIDERED AT RISK. -- * * * (3) Certain borrowed amounts excluded. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b).↩
5. Section 465(b)(4) provides as follows: (b) AMOUNTS CONSIDERED AT RISK. --
* * * (4) EXCEPTION. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.↩
6. The proposed regulations have not yet been finalized and, therefore, they are merely statements of respondent's position.↩
7. Law v. Commissioner,86 T.C. 1065, 1104 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1053-1054 (1986). In those cases, respondent conceded that the taxpayers be permitted to use the straight-line method. See also Bailey v. Commissioner,90 T.C. 558, 619-621↩ (1988), for a description of how the income forecast method is calculated in the depreciation of motion pictures.
8. See Schwartz v. Commissioner,T.C. Memo. 1987-381↩.